## UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Bankruptcy No. 19-82566 |
| Joseph Paul Klawitter and | ) | |
| Karen Ann Klawitter, | ) | Chapter 7 |
| Debtors. | ) | |
| | ) | Judge Lynch |
| | ) | |
| Patrick S. Layng, United States | ) | |
| Trustee, | ) | |
| Plaintiff, | ) | Adversary No. 20-96026 |
| v. | ) | |
| | ) | |
| Joseph Paul Klawitter and | ) | |
| Karen Ann Klawitter, | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Doctors Joseph and Karen Klawitter[1] are pediatricians with experience running their own business, a small pediatric practice, including guiding that business through its own chapter 7 bankruptcy prior to this case. That case ultimately completed with no distribution of assets. Now before this court for ruling after trial is the objection of the United States Trustee to the Debtors receiving a discharge in their individual bankruptcy.

The U.S. Trustee brings this action under section 727 of the Bankruptcy Code. Count I of his adversary complaint alleges that within one year of their chapter 7 petition date, the Debtors removed, transferred to others, or concealed their property with the intent to hinder, delay or defraud their creditors. The second count alleges

---

[1] Hereinafter "Joseph" or "Karen," respectively, or the "Debtors," collectively.

sixteen instances of false oaths or accounts knowingly and fraudulently made by the Debtors in their bankruptcy schedules and statements. Based on these allegations, the Plaintiff argues that the Debtors should be denied a discharge under 11 U.S.C. §§ 727(a)(2) and (a)(4)(A). The Debtors deny these allegations.

This matter was tried over four days, during which seven witnesses, including the Debtors, testified and dozens of exhibits were admitted into evidence. Having considered the evidence, the stipulations of the parties and the oral and written argument of counsel, the court finds for the reasons set forth below that the Plaintiff has carried his burden on both counts. Accordingly, the Debtors' discharge will be denied.

## INTRODUCTION

Joseph and Karen Klawitter are medical doctors who owned and ran J & K Pediatrics & Associates LLC ("J&K") from approximately July 2001 through April 2018. The business shuttered its doors in April 2018, and with Joseph acting as its corporate representative, filed a chapter 7 petition in December 2018, ultimately completing the bankruptcy with no distribution of assets. *In re J & K Pediatrics & Associates LLC*, Case No. 18-82606.

The evidence shows that, at around the same time the business filed its bankruptcy, the Debtors knew they were insolvent and planned to seek bankruptcy relief for themselves. However, the Debtors waited for nearly a year, or until November 2019, before filing their own individual joint petition under chapter 7. During this time, they actively dissipated non-exempt assets and converted non-

exempt assets to exempt assets, thereby diminishing the assets available for distribution to creditors by the time they ultimately filed their bankruptcy petition. Despite earning more than $345,000 in combined salary between January 2019 and the petition date, the evidence shows that the value of the non-exempt property in their accounts went from more than $90,000 to less than $2,500 in 2019, leaving little non-exempt property for a trustee to administer.

The Debtors dissipated a large portion of the financial accounts and 2019 earnings by paying a non-refundable $35,000 "retainer" to a law firm for no clear benefit; contributing tens of thousands of dollars to Roth IRA accounts, one of which was newly opened; paying tens of thousands of dollars on their adult children's college tuition; and spending thousands of dollars on a timeshare, multiple family vacations, gifts to their adult children and luxury services. The Debtors then concealed many of these transfers through misstatements and omissions in their bankruptcy schedules. Their initial bankruptcy schedules did not disclose the $35,000 "retainer" payment, drastically understated the amounts of tuition payments they made, omitted or undervalued certain assets, and otherwise contained numerous errors and omissions related to their income, assets, creditors, and finances.

While the Debtors largely blame their bankruptcy counsel for the errors and omissions in their schedules and claim that they did not intend to hinder, delay or defraud creditors through the transfers, and while Karen asserts that she relied completely on her husband as to the contents of the schedules and that he initiated at least a large portion of the transfers, the evidence shows that both Karen and

Joseph intentionally transferred or concealed property with the intent to hinder, delay or defraud creditors, and both Karen and Joseph made false oaths in or in connection with this bankruptcy case.  Accordingly, both Debtors will be denied a discharge.

## PROCEDURE AND JURISDICTION

The adversary complaint seeks to deny the discharge of both Debtors under 11 U.S.C. § 727(a)(2) for transfer or concealment of property and 11 U.S.C. § 727(a)(4)(A) for false oaths. The Debtors timely answered, and after the opportunity for discovery, the court conducted a trial over the course of several weeks via the court's video teleconference platform.  During the trial the court heard testimony from both Debtors, their adult son Joseph Klawitter, Jr. ("Joey"), the chapter 7 Trustee, the U.S. Trustee's paralegal, and two attorneys who represented the Debtors in their underlying bankruptcy.  More than fifty exhibits were admitted into evidence, and the court also received two sets of the parties' stipulations.  For its decision, the court also takes judicial notice of its own docket. *See, e.g., Levine v. Egidi*, No. 93 C 188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993).

Discharge is a right that is expressly created by title 11 and would have no existence if not created by the Bankruptcy Code.  Thus, proceedings on an objection to a debtor's discharge arise in a case under title 11. *See Kontrick v. Ryan*, 540 U.S. 443 (2004) ("Congress authorized bankruptcy courts to adjudicate, inter alia, objections to discharge.").  Therefore, this court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the

United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(J) in which this court has constitutional authority to enter final orders. *See, e.g., In re Yotis*, 521 B.R. 625, 631 (Bankr. N.D. Ill. 2014) (discharge "'stems from the bankruptcy itself,' and may constitutionally be decided by a bankruptcy judge") (citing *Stern v. Marshall*, 564 U.S. 462, 499 (2011)). Additionally, both parties consented pursuant to *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015), to entry of final orders and judgments by the court in this case.

## FINDINGS OF FACT[2]

### 1. Background

Joseph and Karen Klawitter are physicians who specialize in pediatric medicine. They met while attending medical school in the Chicago area and have been married for more than twenty-eight years. Karen is a former officer in the United States Air Force. Following the completion of their residency and Karen's military service, they moved to McHenry, Illinois, where they established J&K, their own private practice, in 2001. They owned the practice on a 50/50 basis. Joseph testified that he always did the bookkeeping for J&K using QuickBooks software.

By all accounts Joseph and Karen's efforts initially were successful, and their practice prospered and expanded, eventually employing five employees. However, after a few years of modest success, J&K ran into economic headwinds. In particular,

---

[2] The following findings, together with those set out in the "Discussion" below, set forth the court's findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

starting around 2016, a growing portion of their patients lacked private insurance and relied on Medicaid, which was greatly impacted by the budget crisis in Illinois. During this time, the practice struggled as payments for services from the State of Illinois were delayed or diminished.  By March 2017, the situation had continued to worsen and the Debtors began actively pursuing the sale of the practice.  Although a potential buyer emerged, they withdrew from negotiations in December 2017.  In January 2018, the Debtors notified their patients that J&K would be closing its doors. On April 1, 2018, J&K ceased operations.

Shortly thereafter, Joseph and Karen found new employment as pediatricians with Mercy Healthcare Systems.  Joseph's employment, with a base salary of approximately $250,000 per year and a signing bonus of more than $10,000, began April 9, 2018, less than two weeks after J&K closed.  Karen's employment, with a base annual salary of around $175,000 and a signing bonus of something less than $5,000, began about the same time but at a different location.  Indeed, the Debtors' total income significantly increased, not decreased, after closing J&K.  Their latest amended Statement of Financial Affairs ("SOFA") lists total gross income for 2017 of $215,539, but total gross income of $368,265 for 2018 and $345,832.10 for the first 10 months of 2019. (2d Am. SOFA, questions 4-5, Ex. 13.)  The Debtors were still working for Mercy at the time of their bankruptcy petition and continued working through July 2020, when they switched to different jobs.  In late 2021, Joseph testified that he was then working for Legacy Medical Care with an annual salary of $220,000 and Karen was working at Elk Grove Pediatrics.

Few of the debts listed in the schedules included with the Debtor's bankruptcy petition related directly to their business. They list a claim of $225,000 for their liability on a guaranty of unpaid rent for commercial space as the only claim for which J&K was a codebtor. Of the approximately $1.8 million in total claims that the Debtors scheduled, more than $700,000 was for unpaid personal income taxes, more than $625,000 on a mortgage deficiency claim relating to a 2013 foreclosure on their prior residence, $77,800 in debt on a Florida timeshare, a little more than $75,000 in credit card debt, about $12,000 in student loan debt incurred in the early 1990s and about $11,000 in student loan debt incurred in the early 2000s. Although the schedules state that the timeshare debt was incurred in March 2018, Joseph testified that they had owned the timeshare since 1994, and the 2018 transaction was some form of "restructuring," including "splitting the account into two point banks to assist in transfers and reservations."

The Debtors have five children. At the time of the petition, only one of the children, their teenage daughter, lived with them. The other four children were adults. The Debtors' oldest son, Joey, graduated college in 2018 and enlisted in the Navy during 2019. The other three adult children were attending college as of the petition date. Katie was attending Augustana College and graduated in 2020. Christopher was attending the University of Wisconsin-Milwaukee ("UW-Milwaukee") and graduated sometime after the petition date to pursue a master's degree. Nicholas also attended Augustana but left before graduation to join the Navy. Karen testified that it was her and her husband's "expectation" that they "would help

them through college so that they would earn their degree. Anything thereafter with college is all on them. So, my son that's in grad school, we don't pay a dime of that."

### 2. Depletion of Non-Exempt Assets During the Year Preceding Bankruptcy

On January 25, 2019, four days before paying $4,000 to Hiltz Zanzig & Heiligman LLC to represent them in a future bankruptcy, the Debtors had at least $93,703.39 in liquid assets not subject to any specific exemption.[3] That sum includes $3,069.17 held in Karen's individual checking account (U.S. Bank *61). At that time, she also had an investment account with a value of $43,565.11 (Edward Jones *13) and an investment account inherited from her father in 2017 with a value of $16,911.46 (Edward Jones *15). The Debtors also owned a joint checking account with a balance of $28,459.15 (U.S. Bank *86), and a joint investment account with a value of $1,698.50 (Edward Jones *13). However, despite earning more than $345,000 during 2019 through their petition date of November 5, 2019, they listed in their schedules only a few unencumbered non-exempt assets with which to repay their scheduled unsecured debts of more than $1.6 million, namely: a 2004 Hyundai Elantra and 2009 Ford Focus with a combined value of $4,218, used household

---

[3] The court relies primarily on account statements for the year 2019 received without objection at trial. The court also received a single month statement for a third checking account in Joseph's name also at U.S. Bank. (Ex. 36.) However, that statement covers only June to July 2019 and non-sufficient evidence was presented to enable the court to draw any conclusions as to whether the account held funds at the beginning of the year or on the November petition date. The bank statements for U.S. Bank account *61 reflect a transfer of $3,000 from a bank account ending 4828 on April 5, 2019, and another transfer of $500 on October 1, 2019, but no details about this account were offered by the parties. Although under Illinois law each of the Debtors was entitled to a $4,000 "wildcard" exemption on any personal property, 735 ILCS 5/12-1001(b), in their eventual bankruptcy they used $5,900 of their total $8,000 exemption against other assets, including furniture and household furnishings, exercise equipment and an initially unscheduled ring.

furniture and appliances they valued at $2,000, and a $2,700 rental deposit on their residence which they did not own.

The evidence shows that the Debtors dissipated and transferred their non-exempt assets in a variety of ways.

### a. *$35,000 Advance Payment "Retainer"*

Perhaps the most notable transfer that the Debtors made during the year pre-petition was a payment of $35,000 to the law firm Piercey & Associates ("Piercey") by a check drawn on the Debtor's joint checking account dated August 20, 2019.[4] Piercey was not their counsel in either the business or personal bankruptcy cases. In connection with this, the Debtors offered a one-page letter agreement dated April 18, 2019.[5] This document, signed by Joseph and Karen,[6] states that the Debtors retained Piercey for what the agreement vaguely refers to as representing and providing "legal advice with regard to your medical practices, estate planning, tax planning, business succession, and elder law." (Ex. 34.) The agreement is equally opaque about billings rate and the cost of services, making just a passing reference to "requir[ing] an advance retainer payment of $35,000.00 for [the] services, which we require in full,

---

[4] As discussed more fully *infra*, the primary source of the funds used to pay the check was $31,000 transferred from Karen's checking account to the joint checking account on August 19, 2019. Karen's checking account had a balance of $36,659.90 the business day before the transfer, meaning that the transfer was of most of the value in that account at the time.

[5] The letter agreement was signed by a Piercey attorney, presumably on or about the date of the letter, April 18, 2019. The countersignatures by the Debtors are undated and therefore it is unclear whether they were signed in April when the agreement was returned, later in August when the retainer check was dated, or some other date between those two. While Joseph and Karen did not resist questions at trial that seemed to imply that the agreement was made in April, neither Debtor was asked directly when they signed the agreement.

[6] At trial Karen testified "I didn't retain lawyers; my husband did." However, she did not dispute that she signed the Piercey engagement letter.

and which shall be deemed earned in full upon our receipt of your payment." (*Id.*) The agreement, instead, discusses at some length the nature, purpose and supposed necessity of the $35,000 retainer. It states that ownership of the retainer passes to the law firm "immediately upon payment and may be deposited into our attorney business operating account." The letter goes on to mention that the Debtors were "advised" that they had "the option to pay for our services via a more standard 'security retainer.'" Finally, the letter includes a formulaic statement that the clients "chose" this advance payment retainer because of:

> "1) your [the Debtors'] stated desire to secure my unlimited and immediate availability, 2) your expressed concern for being unable to pay for my services in the future, and 3) your stated desire and need for my representation in the above areas regardless of your future financial success or challenges."

(*Id.*)

Even though the Debtors admit that they knew at the time that they were insolvent, (*see* Ex. 3, ¶ 35), Joseph testified that one of the principal reasons they retained Piercey was "to set up an estate and will planning for our children." However, he admitted that as of November 19, 2021, he had not received any wills, trusts or powers of attorney prepared by Piercey. While claiming that there was "some initial work done" on their will, the debtors presented no details or documentation to support this contention, or Joseph's claim that the firm was "not willing to move forward until" the bankruptcy case was resolved.

In addition, Joseph testified that the Debtors also retained Piercey "to protect us against a civil suit that was quite possibly going to happen." He explained that

this concern arose from a previous medical malpractice lawsuit brought against Karen and their practice.  However, Karen acknowledged maintaining malpractice insurance coverage at relevant times and that her carrier had provided legal counsel to defend her in the previous lawsuit. The evidence further shows that the malpractice carrier had informed Karen by March 1, 2019, that the malpractice lawsuit was dismissed on December 7, 2018. (Ex. 41.)  Karen acknowledged on cross-examination that this was in fact the third time the case had been dismissed, and that she was not aware of any subsequent attempt to revive or refile that action.

While the Debtors claim that they feared that sometime in the future a new suit might be brought by the plaintiff in the thrice-dismissed malpractice action, they presented no credible reason, let alone proof, as to why they needed to pay the $35,000 non-refundable retainer in August 2019 out of a true concern for this. Rather, the evidence is uncontroverted that at that time Karen had malpractice insurance, the malpractice action at issue had been dismissed and her insurer had provided her legal counsel who had defended her and secured the dismissal of the action.  Further, at this time the evidence shows that the Debtors' business had already been through bankruptcy, and they were intending to file a  personal bankruptcy case.  The court finds that the proof presented to it evidences that the Debtors instead paid the $35,000 to Piercey to insulate that money from the Trustee and any distribution to their creditors by their bankruptcy estate, and possibly with the hope that they might later utilize the value of these diverted funds to obtain pre-paid legal services after their bankruptcy completes.

b. *Karen's Investment Account and the Debtors' Joint Investment Account*

On February 11, 2019, Karen transferred a total of $27,000 out of her investment account, with $13,500 going to Joseph's Roth IRA (which had a little more than $5,000 in value at the time) and $13,500 deposited into her own newly opened Roth IRA. Then, on April 26, Karen transferred another $16,711.41 to the Debtors' joint investment account, with that same amount being transferred on the same day from the joint investment account to the Debtors' joint checking account. Three days later, Karen transferred the remaining $4.92 from her investment account to the Debtors' joint investment account. This activity reduced the balance in Karen's investment account to zero. Her investment account never showed a positive balance from that time through the petition date, although as of the petition date the statements from Edward Jones did not show it to be closed. (*See* Ex. 39 at 62, 67.) Several days later, the Debtors transferred $3,105.91 from their joint investment account to their joint checking account. This transfer included the proceeds from the $300 per month that was transferred to the joint investment account from Karen's checking account between October 2018 and May 2019, and the initial $517.50 they used to open the joint investment account in March 2018. This transfer reduced the balance of the joint investment account to zero.

c. *Karen's Inherited IRA*

On October 9, 2019, less than a month before their bankruptcy petition, Karen transferred to the Debtors' then-empty joint investment account $16,360.67 from the investment account she had inherited from her father. The same day, the Debtors transferred the full $16,360.67 from the joint investment account to Karen's checking

account. The following week Karen paid $16.216.99 from her checking account to Augustana College for the tuition and related expenses of her adult children. Aside from $1,817.85 withheld on the distribution for federal income taxes, her inherited investment account held only $95.24 in value by the November 5, 2019 petition date.

### d. *Checking Accounts*

The court received bank statements for calendar year 2019 for the Debtors' joint checking account and Karen's individual checking account at U.S. Bank. Joseph's biweekly salary was deposited into the joint checking account, generally around $4,500 each but sometimes fluctuating as high as $7,000. Karen's biweekly salary was deposited into her checking account, generally between $4,300 and $4,800 each. From time to time, Karen transferred funds from her checking account to the joint checking account. For example, she transferred $4,000 on January 23, 2019; $2,000 on February 11; $4,000 on March 5; $2,000 on April 22; $1,500 on October 16; $2,000 on October 18; and $1,300 on November 4. Also, as discussed above, on August 19, 2019, Karen transferred $31,000 from her checking account to the joint checking account, which funds were used for the $35,000 payment to Piercey the following day.

Karen's checking account held $38,668.24 on January 9, 2019. Over the next thirty days she paid $5,565.05 to Augustana College and $4,019.85 to UW-Milwaukee, and transferred $4,000 to the Debtors' joint checking account. Between August and October, she paid $4,000 to Augustana College from this account. On

September 23, 2019, she paid another $7,250 and $4,306.15 to Augustana and UW-Milwaukee, respectively.[7]

Throughout 2019 the evidence reveals that the Debtors spent heavily via debit card and checks drawn on the two checking accounts on trips, entertainment, luxuries, monthly tanning salons, tickets for theme parks, skydiving, boat tours, escape rooms, and restaurants. For example, on April 30, 2019, the day after the $16,711.41 transfer from the Debtors' joint investment account to their joint checking account cleared, they purchased Walt Disney World tickets for $1,036.28 by debit card for the joint checking account for a family trip they would take in July. From the same account they spent $519.13 on a mid-May road trip to Branson, Missouri, and more than $2,500 in mid-July on the trip to Florida. During the ten months before their petition, they spent $3,471.39 at the online clothing service Stitch Fix, $3,163.23 at Kohl's department store, and $3,182.18 on purchases through Amazon.

They also transferred cash to their adult children from the accounts and made large cash withdrawals. For example, they transferred $400 from their joint checking account to their adult son Christopher in April 2019, and an additional $860 to him between May and July 2019. Between January and July 2019, Karen sent more than $3,900 in Zelle transfers from her checking account to their son Christopher. Karen later withdrew additional cash from her checking account totaling $7,010 in $120 to $520 increments between January 11 and October 24, 2019. Of those amounts,

---

[7] As noted above, she also paid Augustana College $16,216.99 on October 15, 2019, but the court finds that payment to be traceable to the inherited IRA, simply flowing through the checking account, and therefore does not include it in the discussion of dissipation of the checking accounts.

$2,250 was withdrawn within 90 days of the petition date.  Karen then withdrew from her checking account another $450 in cash the day *after* filing the bankruptcy petition.[8]

The Debtors' records reveal that they spent more than $16,000 on maintenance and other fees for a Florida timeshare between January 2019 and the petition date. Despite the economies, if any, the timeshare might provide, the Debtors expended another $10,000 on a March family vacation to Florida, a May vacation to Missouri, and a July trip to Florida.[9]

The Debtors' monthly rent of $2,850, not to mention Joseph's additional $1,359 for rent of a second apartment in Lake Geneva, exceeds by almost $1,000 the IRS Local Housing and Utilities Standards for rent for a family of five or more in McHenry County, Illinois.  With such spending the combined balance of the two checking accounts at U.S. Bank for which the court received statements into evidence dropped from $38,259.97 on January 14, 2019, to $1,257.48 on the November 5, 2019 petition date despite deposits into the account of more than $94,000 of Karen's salary and more than $104,000 of Joseph's salary during this time.

---

[8] This was not merely a matter of the withdrawal being processed post-petition.  In the handwritten withdrawal slip, signed by Karen, she dates the withdrawal November 6, 2019. (Ex. 24 at p. 64.)

[9] It is unclear whether the Debtors took one trip to Florida or two in March 2019.  The bank records show numerous charges to United Airlines on March 7 and a payment to Universal Orlando. Karen testified that she believed the United charges were "airfare for spring break" for a "family vacation." But the bank records also suggest that the Debtors took a March road trip to Florida, as between March 25 and April 1, there are numerous charges at restaurants and stores in Florida, as well as gas stations in Indiana, Tennessee, Kentucky, Georgia and Florida.  Either they took two trips to Florida in March, or Karen was mistaken in her testimony and the March United charges may have related to their July trip.  There is no doubt from the record that they flew in July, as there are four $30 United charges on each of July 11 and July 18 – consistent with a carry-on or upgrade fee – as well as an O'Hare airport parking charge on July 18, 2019.

### 3. Failures to Disclose

It is evident from the record that the Debtors were familiar with bankruptcy in general and chapter 7 filing in particular from the bankruptcy of their company that commenced in 2018.  It is also evident that they had time and the opportunity to plan and prepare before commencing their individual bankruptcy nearly a year after J&K filed its petition.  The petition and schedules which they signed and initially submitted to open this case were electronically filed on November 5, 2019, by Alex Whitt of Hiltz Zanzig & Heiligman LLC, the same attorney Joseph had used for J&K's chapter 7 bankruptcy.  Joseph had signed their company's petition and schedules as an owner.  Karen testified that she was involved in the decision to seek bankruptcy relief for J&K.  She also attended and participated in the meeting of its creditors.[10]

There is no evidence that the Debtors were unexpectedly confronted with a rushed need to file their individual case.  Electronic communications show that at least as early as mid-November 2018 the Debtors were contemplating filing bankruptcy.  The Debtors identified no particular specific urgent event, such as a foreclosure proceeding, that required an emergency filing.  Karen testified that they initially decided to file their own personal bankruptcy when they "got the lawsuit from the landlord" regarding the lease for their defunct medical practice. The summons for that suit was issued October 3, 2018.

---

[10] While Karen's testimony was that she "showed up in court" and "sat in front of a judge," the court finds from context that she was referring to the section 341 meeting of creditors conducted by the case trustee.  The court also takes judicial notice that no motions were filed in the company's bankruptcy and no hearings before the court were held, with the case trustee filing a no-asset report on February 1, 2019, and the case closed February 4, 2019. (*See* Docket, Case No. 18-82606.)

Joseph was in contact with attorney Whitt who sent Joseph draft schedules for a joint petition by the Debtors on November 16, 2018. Joseph asked Whitt "if we qualify for 7 or 13," noting that he would "like to get started on this as soon as possible with the holidays coming up." Between November 2018 and November 2019, Whitt sent the Debtors several different updated versions of bankruptcy schedules. Joseph responded with changes and questions.

Karen later testified that it was her husband who corresponded with the attorneys, helped create the schedules and provided the "paperwork" to sign before the case was filed. However, there is no dispute that both Joseph and Karen knowingly signed their petition, schedules, and SOFA under penalty of perjury. In particular, both Joseph and Karen signed their Declaration About an Individual Debtor's Schedules on November 4, 2019, stating that "Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct." They also both signed at the bottom of their SOFA, stating

> I have read the answers on this *Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that the answers are true and correct. I understand that making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both.

At their meeting of creditors, they both stated under oath without qualification and without hesitation that they had read and reviewed the schedules and that those documents were correct and listed all assets and creditors. At trial, Karen attempted to walk back her previous sworn statements somewhat by offering the unconvincing

explanation that she merely "scanned most of" the petition and schedules and "did not read it fully, because my husband was doing the majority of this."

Notwithstanding the Debtors' sworn assurances to the contrary, the schedules and statements filed with their petition contain numerous significant errors and omissions.

### a. *The Payment to the Piercey Law Firm*

The Debtor's original schedules and statements do not disclose the $35,000 payment to Piercey made less than three months before the Debtors filed their bankruptcy petition. It is not listed under "[s]ecurity deposits and prepayments" in their Schedule A/B, as a "general intangible" or other "financial assets," or anywhere else in the initial Schedule A/B. Nor is the engagement agreement listed as an executory contract in Schedule G. Likewise, the Debtors did not disclose making the $35,000 payment anywhere in their initial SOFA.[11] In particular, question 18 to the SOFA asks: "Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?" Although the Debtors listed in response to question 18 tuition payments of $1,707.15 to UW-Milwaukee and $16,216.99 to Augustana College, they did not disclose the $35,000 payment – the single largest payment or transfer they made during 2019 according to their bank statements.

---

[11] It is not clear what, if any, work Piercey performed for the Debtors, much less when. If it provided legal services before receiving the $35,000 payment, then the payment should have been – but was not – disclosed in response to question 6 as a payment to a creditor within 90 days of the petition date.

The Debtors fail to establish any legitimate purpose or equivalent value received for the payment. But even if it were a legitimate part of their financial affairs, the evidence shows that it was not made in the ordinary course. Indeed, the Piercey agreement evidences that is not the case as the instrument goes to great lengths to emphasize the unusual circumstances and reasons for the payment of its advance security retainer as opposed to, as the agreement puts it, "a more standard 'security retainer.'" (Ex. 34.)

b. *Tuition, Gifts, and other Transfers for the Benefit of Adult Children*

Despite disclosing some tuition payments, the Debtors greatly understated the payments and gifts they made on behalf of and to their adult children during the time leading up to the petition date. In their initial SOFA and schedules, the Debtors also failed to disclose loans from, repayments to, and other financial transactions with their children.

The initial schedules did disclose as non-ordinary course payments the Debtors' tuition payments of $1,706.15 on behalf of their son attending UW-Milwaukee on October 22, 2019, and $16,216.99 to Augustana College on October 15, 2019, for another son. Their bank records, however, show four additional undisclosed payments totaling $7,250 that were made to Augustana College from Karen's checking account between August and October 2019. These records also reveal additional payments to UW-Milwaukee of $600 on September 23, 2019, $1,000 on October 3, 2019, and $1,000 on October 30, 2019. After the U.S. Trustee commenced this adversary proceeding, the Debtors disclosed additional payments to UW-

Milwaukee on November 12, 2018, February 3, 2019, and September 4, 2019, as well as nine others to Augustana College from February 4 to October 23, 2019. They admitted that the checks to Augustana College were tuition payments for their son and daughter.

The fact that the Debtors scheduled some of their tuition payments during this time evidences their awareness of the need to disclose tuition payments. This is further shown by Joseph's communications with his bankruptcy counsel during the year pre-petition in which he shared his concerns that the chapter 7 Trustee would likely investigate and possibly seek to disgorge the tuition payments. In an October 21, 2019, email, for example, Joseph stated,

> At long last, we're ready to file personal bankruptcy. The 17,000 inherited IRA was cashed out to pay for college tuition. I know you said the trustee may want that back, but the kids could not have registered for their next semester without it. If we need to pay it back, we will figure something out.

(Ex. N.) There are several places in the SOFA where tuition payments could be listed, in part depending on whether the Debtors are personally liable on the obligation to the school. (*See, e.g.*, SOFA, item 13 (gifts to adult children) and item 18 (payments not in the ordinary course), Ex. 1.) Yet, these additional payments are nowhere to be found in the original statement.

The bank records also reveal the Debtors' numerous undisclosed gifts to their adult children during the year before their bankruptcy petition. The bank records show at least $3,960 in undisclosed cash transfers to Christopher between January and July 2019. In addition, the evidence reveals the Debtors purchased plane tickets

and made numerous other expenditures for their adult children. Joseph and Karen also omitted payments to their son Nicholas in their initial schedules. They did later admit paying him a total of $500 from September to November 2019, claiming they were repaying a debt despite their failure to initially identify Nicholas as a creditor or list any payments of insider debts within 90 days of the petition. (2d Am. SOFA, Ex. 13.)

### c. *Closed or Omitted Accounts*

The Debtors failed to list closed deposit and investment accounts in their initial schedules and statements, hindering the Trustee's discovery of large pre-petition transfers from those accounts. Specifically, despite listing their exempt Roth IRA accounts, the Debtors did not list in their original Schedule A/B the inherited IRA account which was open but reduced in value to $95.24. While the SOFA requires the disclosure of any financial account closed, moved, sold, or transferred within 1 year pre-petition, the Debtors failed to list the joint investment account or Karen's investment account, even though tens of thousands of dollars had flowed through these accounts during the year pre-petition before being reduced to a balance of zero by the petition date.

### d. *Jewelry*

The Debtors initially disclosed as their only jewelry "wedding rings" valued at $8,200, claiming the wedding rings were fully exempt as "necessary wearing apparel." 735 ILCS 5/12-1001(a). In doing so, they did not disclose another ring Joseph bought Karen in June 2018, which was valued at $1,700. It was later established that the

"anniversary" ring was not included within the $8,200 entry for the wedding rings. The Trustee discovered this omission at the meeting of creditors when he questioned the Debtors about a $898.69 unsecured claim listed as a "Charge Account" for a jewelry store.

e. *Other Errors and Omissions*

The Debtors' initial schedules contained numerous other errors and omissions.[12]  Their original Schedule I incorrectly described monthly deductions of $1,152.49 for Joseph and $922.50 for Karen as mandatory retirement deductions.  In fact, both of these were voluntary.  Their disclosure of year-to-date wages in the original SOFA indicated that Joseph was the sole source of earned income, listing the pre-petition 2019 wages, commissions, bonuses, and tips for "Debtor 1" to be $336,550.00 and "$0.00" for "Debtor 2."  This is inconsistent with Schedule I, where the Debtors stated that both Joseph and Karen had been employed by their current employers for eighteen months.  The second amended SOFA filed by the Debtors in March 2021 restated the household's wage income apart to be $192,081.70" for

---

[12] The complaint listed as an alleged misrepresentation that the Debtors failed to initially disclose that "multiple tax liens had been filed by the Internal Revenue Service against the Defendants years before the Petition Date relating to one or more of the tax years from 2008 through 2017" (Compl. ¶¶ 92-94), initially scheduling their more than $660,000 in federal income taxes assessed between 2009 and 2016 as a general unsecured claim, as well as a little more than $47,000 in income taxes assessed for 2016 and 2017 as unsecured priority claims.  In their amended schedules filed September of the following year, they amended Schedule D to list $407,849.82 of the debt as secured by statutory liens, reducing the general unsecured claim to $253,417.90 and making no change to the $47,266.80 unsecured priority claim.  However, neither party explored the issue of tax liens at trial, and the court finds the issue was abandoned by the U.S. Trustee.  Taking judicial notice of the court's claim registry in the bankruptcy case, the court notes that the IRS in its own proof of claim filed February 7, 2020, asserts its claim as only unsecured, asserting a general unsecured claim of $650,678.59 and an unsecured priority claim of $40,129.96. (Claim No. 12-1.)  Without more, that the IRS's own proof of claim was roughly consistent with the Debtors' original schedules would suggest that any error in the schedule was not intentional.

"Debtor 1" and $153,750.40 for "Debtor 2" for a total of $345,832.10, or $9,282.10 more than what was originally disclosed.

The Debtors stated "No" in response to question 5 in their original SOFA asking whether they received any other income other than wages, commissions, bonuses, or tips during 2017 through 2019. By way of illustration, the question offers as examples interest, dividends, and money collected from lawsuits.  In the second amended SOFA filed in March 2021, however, the Debtors for the first time disclosed receiving $2,025.00 in "Dividends, IRAs / pension / annuities, SSI" in 2018, $4,550.00 in "IRA Distributions" in 2017, and $40,060.00 in "Debtors' business" in 2017.

The Debtors original schedule of assets also did not disclose a number of tangible assets, including a treadmill, rowing machine, carpentry tools, piano, two televisions, two laptop computers, and numerous household furnishings.   Their schedule also failed to list at least $50 in cash, a rental deposit of $1,329.00 for Joseph's apartment in Lake Geneva, the Debtors' medical licenses, several term life insurance policies, health insurance and auto insurance policies, and a lease interest in a 2017 Chevrolet Malibu, among other things.   The Debtors' subsequent amendments acknowledged that they also understated the value of certain disclosed assets, notably their Florida timeshare interest which was understated by more than $30,000.

The Debtors' SOFA as originally filed also failed to disclose that they had closed, moved, sold or transferred any financial accounts or instruments within a year pre-petition. That filing also failed to list the required disclosure of payments of debt

within 90 days pre-petition: $3,987.00 in rent paid to DIT; $8,550.00 in rent paid to Ed Foss; and $300.00 paid to Ally Financial. Nor did the Debtors initially disclose Discover Bank's collection action commenced in McHenry County on October 23, 2019. The Debtors also initially stated that they did not hold or control any property owned by another, failing to disclose such items as the household furnishings owned by the landlord Ed Foss and the Chevrolet Malibu they later claimed to be their son's vehicle. They also failed to initially disclose that they had provided financial statements to their bankruptcy counsel and accountant within two years pre-petition.

Much was made at trial of the purchase of a 2018 Chevrolet Malibu on February 18, 2019, for $20,342.45 with a down payment of $3,500.00 resulting in a balance of $16,842.45 that was financed. The sales documents list both Joseph and the Debtors' son Joey as joint buyers, and jointly liable on the loan. Both were also listed as co-owners on the certificate of title. (Ex. 6.) The U.S. Trustee contended that Joseph was the co-owner of the vehicle and, therefore, should have listed this asset on the Debtors' schedules. The Debtors argued Joseph was only listed as a co-buyer and co-borrower because of Joey's lack of credit, and that the car was always intended to be Joey's and was always used that way. But even if plausible that Joseph in fact understood he was signing as a co-signer on the loan only, the Debtors fail to explain their failure to schedule Joseph's liability on the loan as a claim in either the initial Schedule D or F, or to list Joey as a codebtor on their initial Schedule H. On the other hand, the Debtors did list as a claim their liability on the guaranty of the debt for rent of J&K and included the company as a codebtor on their original Schedule H,

evidencing their awareness of the need to schedule guarantees and joint debts. Additionally, not until their second amendment to the SOFA in March 2021 did the Debtors disclose the car – which they contend was kept at their residence while Joey was stationed at an out-of-state naval base – as property in their possession that is owned by another.

f. *The Meeting of Creditors*

Joseph and Karen both appeared at the December 27, 2019, meeting of creditors. There each Debtor testified under oath that they did "read, understand, and sign the bankruptcy petition, the schedules and statements filed with the court" and that "to the best of [their] knowledge . . . the information contained in those documents [is] true and correct, . . . lists all of [their] property [and] lists all of [their] creditors." (Ex. 4.) When asked by the Trustee about references in their 2018 federal income tax return to undisclosed stocks, Joseph replied, "they were converted to an IRA," later clarifying that their "stockbroker . . . sold the shares." (*Id.*) The recording of the section 341 meeting reveals that the Debtors did not volunteer information about undisclosed assets and transfers to the Trustee. Rather, the recording reveals that it was up to the Trustee to first raise and then question the Debtors about the sold stocks and the Edward Jones accounts, tuition payments and transfers to the adult children in 2018 and 2019, and the purchase of jewelry in 2018.

On the same day as the 341 meeting, the Trustee filed his initial report of assets. The court later granted the motions of the U.S. Trustee to extend the deadline for the U.S. Trustee alone to object to discharge first through April 24, 2020, and then

through June 30, 2020. On June 29, 2020, the U.S. Trustee filed his adversary complaint.

### g. *Amendments to Schedules*

The Debtors later attempted to correct most of their incorrect statements and omissions on two occasions. On September 30, 2020, they filed Amended Schedules A, B, C, D, E, F, G, H, and I and an Amended SOFA — more than nine months after the meeting of creditors and three months after the U.S. Trustee commenced this action objecting to discharge. Nearly six months later, the Debtors filed Second Amended Schedules A, B, D, E, F, G, and H and a Second Amended SOFA.

In December 2020, the chapter 7 Trustee, citing the potential costs, risks and difficulties involved in pursuing fraudulent conveyance actions against colleges, reached a settlement with the Debtors whereby they agreed to repay $40,000 to the estate in order to satisfy the estate's claims arising from the tuition payments. The court approved the settlement on January 14, 2021. Almost two months later, on March 10, 2021, the Debtors filed their second amended set of schedules and SOFA. Here, for the first time the Debtors, among other things:

    (1)    increased their valuation of the timeshare to show nearly $7,000 in equity;

    (2)    substantially increased the description of their household goods, electronics and sports and hobby equipment;[13]

    (3)    disclosed $50 in cash;

---

[13] Disclosing, among other things, a piano, several TVs and laptops, and increasing the value asserted for these three categories from $4,200 ($3,000 in the original petition) to $5,010.

(4)    disclosed four term life insurance policies, an auto insurance policy and health/vision/dental insurance policies, all with asserted surrender value of $0;

(5)    disclosed their medical licenses, with a value of $0;

(6)    disclosed the $1,329 rental deposit for Joseph's Wisconsin apartment;

(7)    disclosed the $1,500 claim to their son Nicholas and $500 in loan repayments to him in 2019;

(8)    disclosed their daughter Katherine to be a codebtor on a scheduled student loan claim;

(9)    corrected the description of 2019 YTD income to show Karen's portion of wage income, slightly reduce Joseph's 2018 and 2017 income, changed the description of both from Operating Business to Wages, and added 2018 Dividends, IRAs / pension / annuities / SSI income and 2017 Debtors' business income;

(10)   added repayments of debt made within 90 days of the petition to DIT, Ed Foss, and Ally Financial;

(11)   disclosed their payment of car insurance premiums for the benefit of their son Joey within one year pre-petition;

(12)   added the malpractice case against Karen as a suit pending within a year pre-petition;

(13)   disclosed they were holding or controlling property for another, including Joey's 2018 Chevrolet Malibu, and furniture and appliances owned by their landlord; and

(14)   disclosed that they had given business financial statements to others within two years pre-petition.

After the first amendments in September 2020, they did not amend their schedule C, meaning that they did not assert exemptions above the caps listed in the first amendment or assert exemptions against additional property added in the

second set of amendments. For reasons not entirely clear, while the first amendments had added the claim to Ally Financial on the loan Joseph had co-signed with their son Joey for the 2018 Chevy Malibu, the second amendments removed that claim and removed Joey as a codebtor. They also disclosed in the Second Amended SOFA that the value of the listed 2004 Hyundai Elantra as $3,160, unencumbered, and the vehicle (which they had not claimed as exempt) was lost in an accident post-petition in March 2020.

## DISCUSSION

A Chapter 7 debtor is not entitled to a discharge if the debtor:

> with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
> (A)    property of the debtor, within one year before the date of the filing of the petition; or
> (B)    property of the estate, after the date of the filing of the petition;

11 U.S.C. § 727(a)(2). Additionally, a debtor is not entitled to a discharge if the debtor "knowingly and fraudulently, in or in connection with the case--(A) made a false oath or account . . . ." *Id.* § 727(a)(4). Under either subsection, the party objecting to discharge "must establish grounds for denial of discharge under 11 U.S.C. § 727(a) by a preponderance of the evidence." *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011). Fraud is rarely admitted and therefore for both section 727(a)(2) and (a)(4) claims, "intent may be established by circumstantial evidence." *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790-91 (7th Cir. 2002) (citing *In re Krehl*, 86 F.3d 737,

743-44 (7th Cir. 1996); *Smiley v. First Nat'l Bank of Belleville (In re Smiley)*, 864 F.2d 562, 566 (7th Cir. 1989)).

### 1. Count I – Section 727(a)(2) Transfer or Concealment of Property

For the court to sustain an objection to discharge based on section 727(a)(2), the objector must prove:

> (1) that the act complained of was done at a time subsequent to one year before the date of the filing of the petition; (2) with actual intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code; (3) that the act was that of the debtor or his duly authorized agent; (4) that the act consisted of transferring, removing, destroying or concealing any of the debtor's property, or permitting any of these acts to be done.

*Vill. of San Jose*, 284 F.3d at 791 (citing *Lee Supply Corp. v. Agnew (In re Agnew)*, 818 F.2d 1284, 1287 (7th Cir. 1987)).  Concealment "includes preventing discovery, fraudulently transferring or withholding knowledge or information required by law to be made known." *In re Marcus-Rehtmeyer*, 784 F.3d 430, 442 (7th Cir. 2015) (quoting *In re Scott*, 172 F.3d 959, 967 (7th Cir.1999)).  Proof of harm is not needed to support an action under section 727(a)(2). *Vill. of San Jose*, 284 F.3d at 793 (citing *Krehl*, 86 F.3d at 744 n.4 ("Yet so long as the debtor acted with the requisite intent under Section 727(a)(2), his discharge may be denied even if creditors did not suffer any harm.")); *see also Scott*, 172 F.3d at 968.

There is little dispute that the Debtors transferred significant property during the one year before their petition or that their initial schedules and testimony at the meeting of creditors withheld information regarding at least some of those transfers and at least some of their interests in property.  Among the most notable transfers

were the payment of $35,000 to Piercey, the $16,216.99 payment to Augustana College on October 15, 2019, for one adult son's tuition, the $1,706.15 payment to UW-Milwaukee on October 22, 2019, for another son's tuition, and the transfer in February 2019 of $27,000 from Karen's investment account into two Roth IRA accounts that the Debtors would later claim as fully exempt. Although the Debtors initially disclosed the October 15 and October 22 tuition payments, they later admitted in amended schedules that they made more than $42,500 in additional tuition payments during the year pre-petition that they had not previously disclosed – a total of more than $60,000 in tuition for their adult children during that period – including tuition not only for the two sons but their adult daughter. The evidence also shows without dispute that during 2019 they spent more than $16,000 on a Florida timeshare, more than $10,000 on vacations with their 4 adult children twice to Florida and once to Missouri, and transferred at least $3,900 in cash to one of their adult sons.

At least some of the transfers are attributable to both Joseph and Karen. Karen claimed in her testimony that she "was not very involved in the financials at all" and that her "husband did not tell [her] a lot of that stuff." In particular, she testified that her husband paid bills, including payments on their timeshare and tuition payments. However, one of the investment accounts – from which a total of more than $40,000 was transferred out in 2019 – was in Karen's name alone, and the inherited IRA from which more than $16,000 was transferred was under Karen's control only.

Additionally, most if not all the tuition payments as well as many of their other transfers and expenditures were from Karen's checking account. While the August 2019 check for the $35,000 "retainer" payment was drawn on their joint checking account, $31,000 of the funds used for that check – which would not have cleared otherwise – originated from Karen's checking account through a bank transfer the day before. Additionally, Karen testified that even if her husband initiated transfers from her checking and investment account, she was aware of and authorized each transfer or payment. She testified that for each transfer or payment from her accounts she logged in and entered the password to open "it up for him, yes. He didn't do it himself. If I opened my account, he would access it with me, with my knowledge." She further testified that she did this "[m]aybe a couple times a month" and that in each case she "would have authorized my husband to make that transaction." The court therefore finds that, with respect to both Joseph and Karen, a sufficient "act was that of the debtor or his duly authorized agent." *Vill. of San Jose*, 284 F.3d at 791.

The primary issue raised at trial was whether the transfers or concealment were "intentional" acts to delay, hinder or defraud creditors, both as to Joseph and as to Karen. To foreclose discharge under section 727(a)(2) the objector "must establish, among other things, that the debtor intended to deceive her creditors" or the chapter 7 Trustee. *In re Rothermel*, 274 F. App'x 486, 488 (7th Cir. 2008) (citing *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002)). The exception to discharge under section 727(a)(2)(A) "consists of two components: an act (i.e., a transfer or a concealment of

property) and an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor)." *Kontrick*, 295 F.3d at 736. Fraud is not always required, as discharge must be denied if the debtor "intended to hinder or delay his creditors, even if he had no intent to defraud them." *Smiley*, 864 F.2d at 568.

### a. *The $35,000 Retainer*

The Debtors claim that each of the transfers and payments at issue were motivated by other considerations rather than intent to hinder, delay, or defraud their creditors. For example, they claim that the $35,000 "retainer" was to defend Karen from a medical malpractice claim and to set up a will and other estate planning documents for the Debtors. But neither explanation is plausible under the circumstances or otherwise a satisfactory defense. First, the Debtors showed no actual value they received pre-petition from the payment. They admit that no malpractice suit was pending between the date of retention and the petition date. To the contrary, it is undisputed that Karen was notified by her medical malpractice insurance carrier in March 2019 that the suit had been dismissed on December 7, 2018. (Ex. 41.)

While the Debtors claim they feared that the malpractice action might be restarted sometime in the future, they offer no credible explanation why they needed to pay counsel a retainer for malpractice defense services in August 2019, less than 90 days before filing their bankruptcy petition. By then, the evidence shows, the Debtors intended to file their petition and had already paid separate bankruptcy counsel to prepare and commence this chapter 7 case. Karen admitted that her

insurance company provided the defense attorney who handled the malpractice action which she now claims she feared would be renewed.  The letter from the malpractice insurer notifying Karen of the dismissal of that action does not suggest her coverage would be terminated, but to the contrary advises her that if she is "served with a new Summons and Complaint, please notify us immediately and we will reopen our file." (*Id.*)

The Debtors do not contend that a potential medical malpractice claim which had accrued pre-petition could not be addressed and discharged in the  bankruptcy they contemplated by August 2019. *See, e.g., Kawaauhau v. Geiger*, 523 U.S. 57 (1998) (medical malpractice claim based on mere negligent or reckless conduct remained dischargeable).  Nor do they explain why they needed, while insolvent, a will or other estate planning prior to their bankruptcy, much less why a retainer of $35,000 bore any relationship to the value of such services.  The record shows, instead, that they did not receive any such instruments prepared by Piercey before the petition date, strongly suggesting there was no such need.

Instead, the record suggests that the $35,000 payment was, if anything, an attempt to convert a cash-equivalent that could have easily been administered by a bankruptcy trustee for the benefits of creditors into a mere right to future legal services that was of no use to the estate but of possible use to the Debtors post-petition.  The timing is particularly probative.  The date of the retention agreement is April 18, 2019.  Less than a week later, on April 24, Joseph wrote in an e-mail to his investment advisor, "I also found a way to protect the other assets. I actually will

need anything not tied up in a retirement exempt fund to be distributed as cash to us." (Ex. 35.)  Two days later, Karen transferred $16,711.41 from her individual investment account to the Debtors' joint investment account, which was then transferred the same day to their joint checking account.  Although they did not ultimately pay the retainer until August 2019, the timing together with the e-mail suggests that it was part of a conscious scheme to, in Joseph's words, "protect the other assets" in their future bankruptcy. (*Id.*)

The actual payment tracked the bankruptcy petition.  The Debtors fail to credibly explain the seeming discrepancy between the date of the retainer agreement and payment date for the retainer.  The apparent delay in paying the retainer without credible explanation further suggests that the $35,000 payment is related to concerns about the bankruptcy the Debtors intended to file rather than to any legitimate exigent need for legal services.  Indeed, the balance of evidence indicates that ensuring the transfer of funds to this third party rather than the actual receipt of services from Piercey was key for the Debtors at that time.

Structuring the transfer as a pre-paid, non-refundable "retainer" rather than a traditional security retainer or deposit made it more difficult for a future trustee to demand turnover or refund of amounts in excess of the value of services provided. Indeed, the language of the retention agreement itself suggests that the Debtors were concerned about keeping the funds from their creditors.  In explaining why the Debtors chose to fully pay in advance rather than "a more standard 'security retainer,'" the agreement highlights the Debtors' "expressed *concern for being unable*

*to pay for [the attorney's] services in the future*, and [their] stated desire and need for [his] representation in the above areas *regardless of your future financial success or challenges.*" (Ex. 34 (emphasis added).)  Given that the payment was made at a time the Debtors knew they were insolvent, had already decided to file bankruptcy and only a few months before they actually filed their petition, the "concerns" regarding their future finances and ability to pay clearly refer to the impending bankruptcy.  Additionally, since the Debtors had no actual need for services at the time and likely could not predict exactly when or what type of services they would need in the future, they kept the description of future services vague in the agreement.

The court emphasizes that the conclusion it reaches here is based on the particular circumstances of this case.  By no means is it meant to suggest that pre-petition payments of legal retainers are presumptively questionable.   Indeed, payments for counsel to pursue money claims against others may actually benefit creditors to the extent that recoveries are used to repay existing debts.  But this was an unusual transfer in terms of size, in proximity to the bankruptcy filing, in the vagueness of the covered services, in the vagueness of the nature or value of services promised and how services would be applied against the retainer, and in the fact that the Debtors could not identify anything of true value received from the law firm pre-petition.  To those factors, the court will add the Debtors' later concealment of the transfer by failing to initially disclose it in their bankruptcy filings.  Based on the evidence, this transaction was far from the Debtors' "ordinary course of . . . business

or financial affairs," as the Debtors concede in their amended SOFA.  Yet they did not disclose the transfer in their initial schedules.  Nor did they initially schedule the value of the pre-paid services as an asset, despite the schedule containing a line for "Security deposits and prepayments."

The failure to initially disclose anything about the transfer that could have led the chapter 7 Trustee to learn of the payment further supports the finding that the transfer was paid with intent to hinder, delay, or defraud creditors.  Indeed, the chapter 7 Trustee testified at trial that he only learned of the payment after discovery of a copy of the check while reviewing financial records produced by the Debtors.  While the Debtors did subsequently amend their schedules in late September 2020 to disclose the payment, such amendment was a year after the petition date, and well after the U.S. Trustee filed his complaint objecting to discharge which specifically references the failure to disclose the transaction.

Taking all the evidence of the circumstances into consideration, the court finds that the initial omission of the retainer payment in their schedules was more than a mere mistake.  The court also does not find convincing Karen's suggestion that she was unaware of or uninvolved with the payment.  She testified generally that she "didn't retain lawyers; my husband did." However, the engagement letter from Piercey detailing the $35,000 retainer is not only directed to both Joseph and Karen, but is also countersigned with an ink signature by both Joseph and Karen. (Ex. 34.) While it is unclear from the only copy of the check submitted into evidence whether

it was signed by Joseph or Karen,[14] there are other indications that she was involved in the transfer.  She testified that at least one of the purposes of the retention was to "help" in a "civil suit against [her]."  The evidence also showed that, although drawn on their joint checking account, the primary source of the payment was a transfer of $31,000 from Karen's individual checking account the day before.

Additionally, it was the largest single transaction the Debtors made during 2019.  Joseph testified that $35,000 "was a lot of money to [him] during calendar year 2019."  Karen testified that she could not recall making any similarly large payment other than possibly "taxes" in the past.  The size of the payment, together with its proximity less than three months before their bankruptcy, makes it difficult to believe that either Joseph or Karen simply forgot about it when they signed under oath that their bankruptcy petition and schedules were true and accurate.  They scheduled the total value of their assets as only $123,488, meaning the amount of the transfer – and if it was for reasonably equivalent value then presumably the value of the unperformed legal services – was more than 25% of the value of their other disclosed assets.  They listed as "Security deposits and prepayments" a $2,700 rental deposit, but did not list this retainer payment that was more than ten times larger. (Ex. 1.) They listed their January 2019 payment of $5,000 to their bankruptcy counsel, but

---

[14] The court received account statements from a joint checking account the Debtors held at U.S. Bank, which included an image a $35,000.00 check to Piercey. (Ex. 25 at 64.)  However, the check image includes only the typed words "Signature on File" in the space where a signature would normally appear, making it unclear whether Joseph or Karen drafted the actual check.  Additionally, the fact that the check image, like many others within the account statements, has only typed words and differs in general appearance from several other check images with handwritten dates, amounts, payees and signatures, suggests that it is not an image of an actual check at all.  It is therefore unclear whether the payment drawn on the checking account was via a physical check or some form of electronic transfer.

did not list the payment to Piercey that was seven times larger and seven months closer to their bankruptcy petition.[15]  Any suggestion that the failure to disclose this payment is a matter of mere oversight flies in the face of the great weight of the evidence presented.

### b. *Other Transfers*

While the retainer payment is likely sufficient on its own to deny the Debtors a discharge, the Debtors' other transfers further support a finding that they had a conscious scheme during the year pre-petition to reduce assets available to creditors in their anticipated bankruptcy case or otherwise hinder creditors.  These include their conversion of non-exempt investment accounts into exempt retirement accounts, their large payments of college tuition for three adult children, gifts to their adult children, and extravagant spending on vacations and services for themselves and their children.

Courts have struggled with the question as to if and when conversion of non-exempt to exempt assets will support an action under section 727(a)(2). *See, e.g., OTE Dev. USA, Inc. v. Warren (In re Warren),* 512 F.3d 1241, 1249 (10th Cir. 2008) ("One of the more difficult issues in bankruptcy law is deciding when, if ever, an intent to defraud creditors can be shown by the debtor's conversion of nonexempt assets to

---

[15] The court does not imply that the payment to Piercey should have been listed in the same place in the SOFA as the payment to bankruptcy counsel.  Question 16 asks for transfers or payments within one year before the petition "to anyone you consulted about seeking bankruptcy or preparing a bankruptcy petition."  Rather, the transfer more likely should have been disclosed in response to question 18 as a transfer not in the ordinary course of business or financial affairs, as they later did in their amended statements.  In their initial statement, they disclosed two tuition payments totaling approximately $18,000 in response to that question, yet failed to disclose the $35,000 retainer payment which was almost twice as large and even less "ordinary."

exempt assets.") As the court in *Warren* notes, "[a]ny such conversion is highly likely to harm creditors because it removes their access to some of the debtor's wealth. But the very purpose of having exemptions is to permit a debtor to retain certain necessities (although one could dispute whether exemptions are limited to necessities) without fear of creditors taking them." *Id.* The Seventh Circuit has held that "bankruptcy planning [is not] necessarily . . . a fraud on creditors," and instead held that courts should "deny discharge only where the debtor has committed some act extrinsic to the conversion which hinders, delays or defrauds." *Smiley*, 864 F.2d at 567. Such "extrinsic signs of fraud" can include "(1) that the debtor obtained credit in order to purchase exempt property; (2) that the conversion occurred after the entry of a large judgment against the debtor; (3) that the debtor had engaged in a pattern of sharp dealing prior to bankruptcy; and (4) that the conversion rendered the debtor insolvent." *Id.* Other courts have considered other factors as well, such as "the lack or inadequacy of consideration for the property received; . . . whether the transferor retains possession, control, benefits, or use of the property in question; . . . the cumulative effect of the debtor's transactions and course of conduct after the onset of financial difficulties or threat of suit by creditors; and . . . the general chronology and timing of the transfer in question." *Jennings v. Maxfield (In re Jennings)*, 533 F.3d 1333, 1339 (11th Cir. 2008) (citing *In re Marrama*, 445 F.3d 518, 522 (1st Cir. 2006)).

The U.S. Trustee met his burden here to show extrinsic signs of fraud. The transfers from investment accounts to retirement accounts were part of a pattern of transfers to third parties, such as the $35,000 retainer fee, undisclosed tuition

payments for their adult children, and immoderate spending on vacations and gifts for their adult children. The Debtors admit that they knew they were insolvent for all of 2019. The transfers, including the transfers into the retirement accounts, drastically reduced the amount of assets available to the bankruptcy estate. Even though the chapter 7 Trustee was able to regain some value for the estate through his settlement of potential avoidance and turnover actions against the Debtors and their children, the transfers made it more difficult. Moreover, a debtor's later efforts to correct or "undo" transfers will not necessarily forestall denial of discharge, particularly where the retransfer is post-petition or "where property was recovered only as a result of the action of the bankruptcy trustee and court." *Smiley*, 864 F.2d at 566.

The Debtors intentions here are evident not only from the scope and timing of these transfers, but also from what was involved. For example, it is notable the Debtors both elected to transfer the assets into Roth IRAs rather than a traditional IRA. A notable feature of Roth IRAs is the greater flexibility it affords the holder to later withdraw from the account prior to retirement tax-free and without incurring penalty. *See, e.g.,* § 25C:30. Roth IRAs generally, 6 Mertens Law of Fed. Income Tax'n § 25C:30 (Aug. 2022 Update). The Debtors contend their intent was simply to save for retirement. However, the evidence shows that this was not part of an ordinary practice of saving, but rather a drastic change in practice made at a time when the Debtors were aware they were insolvent and were actively contemplating

bankruptcy.[16]  Additionally, the stated retirement objective could have been readily accomplished through an ordinary IRA.  The more-easily reversable character of a Roth IRA post-bankruptcy thus appears akin to badges of fraud where the transferor retains possession, control, benefits, or use of the property.

The Debtors' concealment of their tuition payments benefitting their adult children demonstrate several extrinsic signs of fraud and contributed to the overall pattern of hindering or delaying the recovery of non-exempt assets. *See Eifler v. Wilson & Muir Bank & Tr. Co.*, No. 3:13CV-00785-JHM, 2014 WL 314473 (W.D. Ky. Jan. 27, 2014) (among other transfers demonstrating badges of fraud, payments of tuition benefitting insider children, none of which were properly disclosed in statement of financial affairs, warranted denial of discharge under both 727(a)(2) and (a)(4)).  The testimony regarding Karen's inherited IRA shows that in making payments from that asset, they were consciously thinking about keeping the asset away from creditors and not merely thinking about the need to pay tuition.  Joseph testified, "We were concerned about having the IRAs moved into a retirement fund that would either jeopardize the bankruptcy, or the bankruptcy would jeopardize the inheritance that Karen's father worked very hard all his life to give to his children." In a September 23, 2019 e-mail from Joseph to their investment advisor, Joseph states, "It seems our bankruptcy may not protect Karen's inherited IRA according to those lawyers.  Just curious if you had any thought on that." (Ex. 37.)  When asked

---

[16] Joseph testified at the meeting of creditors that in late 2018 or early 2019 they converted stocks and funds to IRAs because, in his words, "we wanted to start saving for our future," but further explained that "at that point we didn't really have much put aside." (Ex. 4.)

about the e-mail, and about whether they had considered simply filing bankruptcy in September and allowing a trustee to liquidate the account, Joseph testified, "I don't know that that was a consideration . . . . And my wife was very close to her father, and so liquidating his retirement didn't occur that that was an option to us." In response to questions posed by his own counsel, he stated: "Karen's father also was an advocate for education. And at the time that we had inherited the money, we used it for the tuition payments so that the student loan burden would be less when our kids finished college."

This testimony and the other evidence presented at trial show that the Debtors felt that they should not allow Karen's inheritance from her father go to creditors rather than to something they considered more in line with her father's wishes. But such considerations do not change the facts that, prior to the payments, the money would have been available to pay allowed claims of the Debtors' unsecured creditors and the Debtors avoided that outcome by these transfers. Karen inherited the money; it was not bequeathed to her children. The Debtors did not invest the funds in college savings accounts or give it to their children while they were still solvent and not actively considering bankruptcy. Instead, the inheritance sat in the account until less than a month before they filed their petition and only after their bankruptcy counsel warned them that it would likely be liquidated by a bankruptcy trustee.

The Debtors also attempt to cast blame on their bankruptcy counsel for the challenged transfers, but the court is not persuaded. In closing argument, Debtors argued that their bankruptcy counsel "never warned the debtors that use of their

inheritance to fund their IRAs, pay tuition and provide for legal counsel may give rise to an objection to discharge under 727(a)(2). The only warning counsel gave: Transfers may be avoidable." However, the communications between Joseph and both his attorneys and his investment advisor show that the Debtors were cognizant at the time of the various transfers that they were potentially fraudulent. For example, in an April 24, 2019 e-mail from Joseph to the Debtors' investment advisor regarding the possibility of contributing funds to an IRA prior to filing bankruptcy, Joseph cuts and pastes in different colors what he refers to as "the info from our lawyers about the IRA's":

> The general rule is that as long as you are following the contribution requirements the IRS has for qualified retirement accounts you will be fine. I'm not sure what sources you are looking at but based on the time frames it sounds like you are looking at fraud statutes. Those shouldn't apply to this situation. The timing is less important than whether your advisor followed the contribution guidelines.

(Ex. 35.) While whatever was meant by the attorney remains unclear, it is evident from the message that it was Joseph who initiated questions about the boundaries of what may be transferred and that the Debtors were independently "looking at fraud statutes" at this time. Even if the Debtors took comfort in what they claim was their attorney's advice regarding qualified contributions to an IRA, the same e-mail reveals that the Debtors attempted to go beyond that "advice." Below the pasted text in the e-mail to the investment advisor, Joseph adds: "I also found a way to protect the other assets. I actually will need anything not tied up in a retirement exempt fund to be distributed as cash to us." (*Id.*)

The end result of these transfers and expenditures by the Debtors was the reduction of the combined balance of their two checking accounts at U.S. Bank from $38,259.97 on January 14, 2019, to $1,257.48 as of November 5, 2019. Karen's investment account and their joint investment account dropped from more than $44,600 in January 2019 to $0 as of the petition date, and Karen's inherited IRA dropped from more than $16,000 to less than $100 in the same timeframe. No significant non-exempt assets replaced these dissipated accounts. Indeed, the dissipation likely was even greater considering the Debtors' earnings exceeded $345,000 between January 2019 and the November 5, 2019, petition date.

Taken as a whole, the evidence demonstrates that both Debtors transferred assets with actual intent to hinder creditors within one year prior to their bankruptcy and took steps to conceal at least some of those transfers and assets in their initial bankruptcy schedules and SOFA. So finding, the court will enter judgment against both Debtors on Count I, and deny them a discharge.

### 2. Count II – Section 727(a)(4) False Oath

To establish grounds to deny a discharge on the basis of a false oath, the U.S. Trustee must demonstrate that: "(1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011). "A debtor's petition, schedules, statement of financial affairs, statements made at a section 341 meeting, testimony given at a Bankruptcy Rule 2004 examination, and answers to

interrogatories all constitute statements under oath for purposes of section 727(a)(4)(A)." *Schaumburg Bank & Tr. Co. v. Hartford (In re Hartford)*, 525 B.R. 895, 907-08 (Bankr. N.D. Ill. 2015). Omissions in bankruptcy schedules can constitute false statements under oath supporting an objection to discharge under section 727(a)(4). *See, e.g., Skavysh v. Katsman (In re Katsman)*, 771 F.3d 1048 (7th Cir. 2014) (failure to schedule creditors, property jointly owned with ex-husband or alimony payments supported denial of discharge under section 727(a)(4)). Similarly, a debtor's testimony at a section 341 meeting is "under oath," 11 U.S.C. § 343, and false testimony given during that examination may support an objection to discharge, *Hartford*, 525 B.R. at 908.

For purposes of an action under section 727(a)(4), a fact is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Stamat*, 635 F.3d at 982. Because fraud is rarely admitted, "[f]raudulent intent may be proven with circumstantial evidence." *Cantwell & Cantwell v. Vicario*, 464 B.R. 776, 789 (N.D. Ill. 2011) (*citing Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 695 (5th Cir. 2009)). In an action under section 727(A)(4), a "showing of reckless disregard for the truth is sufficient to prove fraudulent intent." *Stamat*, 635 F.3d at 982. Additionally, omissions need not be viewed in isolation. Even if a particular omission does not appear to be fraudulent, where "part of a larger picture of omissions and errors" the "cumulative effect of false statements may . . . evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent."

*Id.* (citing *Duncan*, 562 F.3d at 695). All that is necessary is an intent to deceive, "which need not connote intending to obtain a pecuniary benefit." *Katsman*, 771 F.3d at 1050.

The evidence in this case reveals that Debtors made numerous false material statements in their initial bankruptcy schedules, compounded by their sworn testimony at the section 341 meeting that the schedules were true and correct. The most notable ones related to and helped conceal the transfers and conversion of assets during the year pre-petition, already discussed above in the context of Count I. These include:

(1) failing to disclose the $35,000 payment to Piercey as a transfer not in the ordinary course in response to question 18 of their SOFA, or as either a security deposit or prepayment in Schedule A or as an executory contract in Schedule G;

(2) understating their payments of college tuition on behalf of their three adult children within a year pre-petition by more than $42,000 in their SOFA, instead disclosing only a $1,706.15 payment for one son and a $16,216.99 payment for another son in October 2019;

(3) failing to disclose as an asset in Schedule A Karen's inherited IRA account, the value of which had been reduced from more than $18,000 to approximately $95.24 in the two months before the petition date;

(4) failing to disclose as a financial account or instrument closed, sold, moved, or transferred within a year pre-petition:

    a. Karen's investment account at Edward Jones which had a balance of more than $43,000 in January 2019, from which in February 2019 $13,500 was transferred to Joseph's Roth IRA and $13,500 was transferred to Karen's newly opened Roth IRA, and from which the remainder of the account was transferred in April 2019;

    b. the Debtor's joint investment account at Edward Jones which had a balance of over $2,800 in April 2019 which was reduced to zero by May 2019; and

(5) failing to disclose their adult son Nicholas as a creditor with a claim of $1,500 for money loaned in September 2019 in Schedule E/F, or that they had repaid him $500 on that loan between September and November 2019 as a payment to an insider within one year pre-petition in their SOFA.

Their initial schedules and SOFA also contained many other omissions and misstatements, some of which are minor, but which collectively demonstrate a pattern of reckless disregard for the truth, notably:

(1) Omitting assets from Schedule A, including:

    a. The wedding anniversary band purchased in 2018 which the Debtors later valued at $1,700;

    b. The treadmill, rowing machine and carpentry tools the Debtors later collectively valued at $1,200;

    c. The lease deposit for Joseph's Wisconsin apartment of $1,329;

    d. An upright piano the Debtors later valued at $100;

(2) Failing to disclose that Joseph had co-signed a car loan to their son Joey to secure a 2018 Chevrolet Malibu purchased by Joey in February 2019;

(3) Identifying their monthly deductions from income for retirement contributions of $1,152.49 for Joseph and $922.50 for Karen to be mandatory rather than voluntary in their initial Schedule I;

(4) Understating their gross income to date for 2019 by more than $9,000, incorrectly attributing the full income to Joseph, and listing Karen's income as $0 in their original SOFA;[17]

(5) Failing to disclose in their initial SOFA potentially preferential payments of debt within 90 days of their petition including $3,987 to one landlord, $8,550 to another landlord, and $300 to Ally Financial on a car loan;

(6)  Failing to disclose in their initial SOFA the pending  collection action brought by Discover Bank; and

---

[17] Even the Second Amended SOFA continues to state Karen's gross income to be $0 for 2017 and 2018, notwithstanding her testimony at trial that she was employed at Mercy Healthcare and earning a salary for much of 2018, and also was paid by J&K during its last three months of operation in early 2018.

(7) Other miscellaneous errors and omissions, including omission of licenses and insurance policies of negligible liquidation value, issuance of past financial statements and records, and imprecise or inaccurate descriptions of various assets, leases, income and claims.

Section 521(a) of the Bankruptcy Code requires debtors to make information about all assets known in their schedules. *In re Yonikus*, 974 F.2d 901, 904 (7th Cir. 1992) (explaining that debtors have an "absolute duty" to report whatever interests they hold in property). While most or all of the initial errors were subsequently corrected in amended schedules and statements, such amendment does not remove the fraudulent nature of the earlier statements. As the Seventh Circuit has noted, the "operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive." *Stamat*, 635 F.3d at 982 (citing *Payne v. Wood*, 775 F.2d 202, 205 (7th Cir. 1985)).

The Debtors' first amended schedules and statements were not filed until September 30, 2020, more than three months after the U.S. Trustee filed his adversary complaint objecting to their discharge. While this filing addressed many of the more material omissions in their initial schedules and SOFA, some – including the loan and repayments to their son Nicholas, the preference period payments, and several minor assets such as the Wisconsin rental deposit, cash on hand, the piano, and licenses and insurance policies – were not corrected until the second set of amendments filed in March 2021.

Both Debtors testified at their meeting of creditors, with their bankruptcy counsel at their side.  As discussed above, the recording of the meeting of creditors held on December 27, 2019, reveals the chapter 7 Trustee raising concerns about possible misstatements and omissions with the Debtors, but the Debtors never qualified their sworn attestations given at the beginning of the meeting as to the accuracy and completeness of the information in their original bankruptcy schedules and SOFA.  (Ex. 4.)

The Debtors now attempt to largely blame their bankruptcy attorneys for the omissions and misstatements found in their original schedules and statements, arguing that they had provided all necessary information to counsel and relied on what the attorneys then prepared when signing the schedules.  But it is not disputed that both Joseph and Karen freely signed declarations on November 4, 2019, in which they both declared under penalty of perjury that they had read the bankruptcy schedules and SOFA and that they were true and correct. (Ex. 1.)  Both Joseph and Karen later affirmed under oath and without equivocation at the section 341 meeting of creditors in December 2019 that they had read and reviewed the schedules, and that they were correct and listed all assets and creditors. (Ex. 4.)  In light of the evidence presented in this case as to the Debtors' circumstances and conduct in connection with the planning and filing of their bankruptcy, the court finds their recent testimony attempting to disclaim their sworn affirmations – now claiming that in fact they had merely "skimmed" at least portions of their schedules, and Karen's trial testimony at trial that she blindly "trusted [her] husband and [their] lawyers to

make sure everything was correct" – to be self-serving, lacking credibly and wholly unpersuasive.

Many if not most of the errors and omissions in the original schedules were not a matter of failing to understand difficult legal concepts or nuance. To the contrary, they should have been easily noticeable to a layperson – particularly to highly educated medical doctors experienced in operating their own medical practice. The omissions involve substantial items and recent events, such as the anniversary ring that Joseph had purchased and given Karen less than two years before, a purchase paid with a loan he was then still paying off. They include the $35,000 retainer given to a newly hired law firm for non-bankruptcy matters just a few months before the petition date and while the Debtors were preparing to file this case. They include loans from and repayments to their son made in the months leading up to their bankruptcy. Moreover, the fact that the Debtors disclosed a handful of the tuition payments and one rental deposit strongly indicates that they understood their obligation to disclose such items. Their selective disclosures only confirm the incredibility of their claim to be unaware of their obligation to disclose other material payments and transfers, such as the more than $40,000 in tuition payments on account of their adult children. But even if there were deficiencies in the schedules that they did not notice immediately, they certainly were made quite aware of them from the chapter 7 Trustee's interrogation during the meeting of creditors and then again when the U.S. Trustee served them with his complaint. Yet they continued to remain silent, delaying for additional months before finally amending their

schedules, and then only doing so after discovery in the adversary proceeding was well under way.

Nor was theirs a rushed bankruptcy filing.  The evidence shows that the Debtors were planning to file their individual bankruptcy for more than a year.  They do not indicate there was any sudden unexpected event that necessitated that they rush in unprepared with an ill-considered emergency filing.  Indeed, at the section 341 meeting, Joseph explained that the Debtors waited as long as they did to file their individual bankruptcy after the 2018 corporate bankruptcy because they "were trying to get all our documents in order."  Correspondence between Joseph and their bankruptcy counsel during that period shows that at least Joseph was highly attentive and actively reviewed draft schedules, making numerous comments and corrections to their counsel.  For example, in a January 21, 2019 e-mail from Joseph to their bankruptcy counsel in response to a set of draft schedules counsel had sent, Joseph lists numerous corrections to line items for schedules A, I and J.  Also, in response to a listing in the draft of stocks, mutual funds and a "settlement check," Joseph corrects the attorney's draft, writing, "#32 Stocks and Mutual Funds 45,000 will be converted to 401K. Settlement check 41000 also coverted [sic] to IRA after college tuition is paid out of it." (Ex. F.)

Additionally, the Debtors' bankruptcy counsel had specifically warned them in advance of the need to accurately account for and schedule their payments of tuition.  In a January 24, 2019 e-mail to Joseph's email account, their attorney warned them: "concerning . . . tuition, you generally have to disclose any large transfers of property

or gifts made within two years of the filing." (Ex. G.)  In late August 2019, their counsel sent them revised draft schedules, to which Joseph made detailed corrections both by hand-marking the draft and by commenting in the text of the email.  In particular, their attorney asked them:

> 3. In the past two years, did you sell, trade, or otherwise transfer any property to anyone, other than in the ordinary course of your financial affairs? 4. Within the last year, did you make a payment on a debt for the benefit of a family member?

(Ex. J.) Joseph responded in his August 29, 2019 e-mail, writing: "In answer to questions 3 and 4 below, both are no." (*Id.*)  In a September 10, 2019 e-mail in response to some questions from bankruptcy counsel, Joseph gives further details on his comments and corrections. (Ex. K.)  His attorney also asks what happened to the "funds from the stock/mutual funds ($45,000) and the settlement ($41,000) used to open the IRA accounts," to which Joseph responds, "Some of the money was used to open IRA's and some went to another lawyer.  There is none left." (*Id.*)  Joseph further demonstrates his understanding of the need for accurate and up-to-date information in the schedules, noting that their "checking accounts vary depending on the proximity to payday," and noting that if counsel needs "an exact balance" he "can get that for you." (*Id.*)

In an October 22, 2019 e-mail, bankruptcy counsel warns the Debtors that, "Because we will need to disclose the payment made for college tuition, I will need the date the payments were made and the name and address of the persons you paid from the cashed out IRA." (Ex. N.)  Joseph responds by e-mail on October 25, 2019, but lists only $18,520 in payments, stating that they paid $1,706.15 to UW-

Milwaukee on October 22, 2019, payments of $9,963 and $6,253.99 to Augustana on the October 15, and $598 to Illinois for 2016 state taxes. (*Id.*) Finally, in an October 28, 2019 email addressed to both "Joe & Karen," bankruptcy counsel attaches for their review their "completed petition." (Ex. O.) In the e-mail, counsel specifically warns them to keep "in mind that you are signing the petition under oath, please review the petition again and let us know if anything needs changing." (*Id.*) Counsel cautions them again in the e-mail about the possibility the trustee may seek to avoid tuition payments and also warns them that the schedules reflect a total value of nonexempt property of $17,401,[18] which "is spread across many assets, any one of which may be too burdensome for a trustee to take and sell," but may potentially be pursued by a trustee in "exercise [of] his or her discretion." (*Id.*)

These communications demonstrate that the Debtors were not blindly relying on their counsel to prepare schedules. If anything, the evidence shows especially Joseph's active involvement in the revision of various drafts of their bankruptcy submissions during the year pre-petition and demonstrates that both Debtors were specifically and repeatedly warned of the need to accurately disclose information in the schedules and statements they would be filing. But even if that were not the case, the Debtors may not insulate themselves by asserting that they have failed to read their schedules before signing and filing them. *Ross v. Wolpe (In re Wolpe)*, Nos. 09-

---

[18] The most notable difference between the draft Schedule A attached to the October e-mail and the actual Schedule A that the Debtors filed with their petition eight days later is that the total value listed for four deposit accounts at U.S. Bank drops from $10,483 in the draft to $2,000 in the filed schedule. (*Compare* Ex. O *with* Ex. 1.)

13469, 09-90130, 2013 Bankr. LEXIS 1618, at \*19 (Bankr. N.D.N.Y. Apr. 18, 2013)

(citing *In re Zimmerman*, 320 B.R. 800, 806 (Bankr. M.D. Pa. 2005)).  Indeed,

> if a debtor fails to read his or her bankruptcy schedules or Statement of Financial Affairs but nevertheless signs the declaration that is included at the end of such documents to the effect that he or she has read such document, then such debtor has, at a minimum, fraudulently uttered a false oath for purposes of § 727(a)(4)(A) in the form of such declaration . . . . [I]f a debtor plays any role in the publication of the false disclosure or omission itself, such as by providing or failing to provide relevant information to the preparer of his or her bankruptcy schedules or Statement of Financial Affairs, then such debtor has made a false oath in the form of such false disclosure or omission, which oath is also deemed to be fraudulently uttered by virtue of such debtor's failure to read such documents because, by not so reading, the debtor exhibits a reckless indifference to the truth, which recklessness . . . is the equivalent of fraud.

*Id.* (quoting *Bohm v. Dolata (In re Dolata)*, 306 B.R. 97, 149-50 (Bankr. W.D. Pa. 2004)).

Nor, after carefully weighing the testimony and evidence presented at trial, can the court accept Karen's assertion that she relied completely on her husband and attorneys as to the accuracy of the schedules – an assertion contrary to her testimony under oath at the section 341 meeting of creditors that she had read and reviewed the petition and schedules and that they were true and correct.  While Joseph may have been more involved in the preparation of the schedules and communications with counsel, the court must also conclude from the evidence presented that Karen, too, was aware of the contents and the material deficiencies of their submissions, which she personally vouched for under oath without reservation at the meeting of creditors.  She does not contend, as the weight of the evidence shows she cannot, to be unaware of the various undisclosed transfers and payments mentioned above,

many of which came from her own accounts and went to the benefit of her adult children. That she now asserts at trial that she only skimmed the schedules and SOFA and was not aware of their numerous false statements fails to address her sworn testimony at the meeting of creditors when she vouched for the truthfulness and completeness of those filings. Moreover, "[h]er signature on those documents warrants an inference that she knew what she was signing, or what has the same legal significance, deliberately refused to acquaint herself with the contents, fearing what she would discover if she did." *Magna Bank of Columbia v. Culpepper (In re Culpepper)*, Adv. No. 89-0250, 1990 Bankr. LEXIS 3080, at *17 (S.D. Ill. Apr. 6, 1990) (citing *U.S. v. White*, 879 F.2d 1509 (7th Cir. 1988)).

This is not the case of an unsophisticated spouse leading a secluded life. Karen can rightly boast of her personal and professional accomplishments over the years following her graduation from medical school. A retired Air Force major, Karen helped found J&K and guided it as a fifty percent owner as it grew. And she is not new to the bankruptcy process having been the co-owner of that company throughout its own chapter 7 bankruptcy. It is apparent that she had to be aware that the Debtors' original bankruptcy submissions were riddled with omissions and false statements, yet at no time did she step forward to volunteer this was so or make any effort to correct these statements before the U.S. Trustee filed this action.

The actions and circumstances established at trial wholly negate any argument that the Debtors' omissions and false answers, and both Debtors' later sworn testimony vouching for their completeness and accuracy, were mere oversights

or innocent errors.  Taken as a whole, the evidence warrants the inference that the schedules and statements were intentionally false or signed with reckless indifference to the truth.  *See Stamat,* 635 F.3d at 982.

The Plaintiff having met his burden under section 727(a)(4), the Debtors will be denied a discharge under that provision as well.

## CONCLUSION

Accordingly, judgment will be entered in favor of the U.S. Trustee against both Debtors on Counts I and II of the complaint.  The Debtors shall be denied a discharge in their bankruptcy case under sections 727(a)(2) and (a)(4)(A).  A separate judgment will be entered pursuant to Bankruptcy Rule 7058 giving effect to the determinations reached herein.

DATE: September 30, 2022

ENTER:

_____

Thomas M. Lynch
United States Bankruptcy Judge